RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 3 / 23 / 12
    JDB

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| VELMA MARGUARITE CARLSON,<br>  Appellant | CIVIL ACTION<br>1:11-CV-00798 |
| VERSUS | |
| MICHAEL J. ASTRUE,<br>  Appellee | JUDGE DEE D. DRELL<br>MAGISTRATE JUDGE JAMES D. KIRK |

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Velma Marguarite Carlson ("Carlson") filed an application for disability insurance benefits ("DIB") or a period of disability on August 14, 2008, alleging a disability onset date of July 15, 1994 (Tr. p. 81) due to fibromyalgia,[1] chronic fatigue, and ankylosing spondylitis[2] (Tr. p. 101). That application was denied by the

---

[1] Fibromyalgia is a complex rheumatic condition with no known cause or cure. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites. Stedman's Medical Dictionary, 27th ed.

[2] Ankylosing spondylitis is a long-term disease that causes inflammation of the joints between the spinal bones, and the joints between the spine and pelvis. It eventually causes the affected spinal bones to join together. The disease starts with low back pain that comes and goes. Back pain may begin in the sacroiliac joints (between the pelvis and the spine). Over time, it may involve all or part of the spine. You may lose motion or mobility in the lower spine. You may not be able to fully expand your chest because the joints between the ribs are involved. Fatigue is also a common symptom. Other, less common symptoms include: eye inflammation or uveitis, heel pain, hip pain and stiffness, joint pain and joint swelling in the shoulders, knees, and ankles, loss of appetite, slight fever, and weight loss.

Social Security Administration ("SSA") (Tr. p. 53).

A de novo hearing was held before an administrative law judge ("ALJ") on September 19, 2009, at which Carlson appeared with her attorney and a vocational expert (Tr. p. 11). The ALJ found that, as of the date Carlson was last insured for DIB on June 30, 1999, she did not have any severe impairments which precluded her from performing basic work activities and, therefore, she was not under a disability as defined by the Social Security Act (Tr. pp. 45-48).

Carlson requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security.

Carlson next filed an appeal for judicial review of the Commissioner's final decision. Carlson raises the following issues for review on appeal (Doc. 9):

> 1. The ALJ improperly opined that there was insufficient evidence to support Carlson's allegations and testimony.
>
> 2. The ALJ arrived at a residual functional capacity that was contrary to the medical evidence and testimony of Carlson, which the ALJ thought was credible.
>
> 3. The Appeals Council failed to recognize the significance of the additional evidence submitted after the hearing and how it completely supported the testimony

---

Tests for ankylosing spondylitis may include: CBC, ESR, HLA-B27 antigen, X-rays of the spine and pelvis, and an MRI of the spine. MEDLINEplus Health Information, Medical Encyclopedia: Ankylosing spondylitis, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

of the claimant.

The Commissioner filed a response to Carlson's appeal (Doc. 10), to which Carlson replied (Doc. 13). Carlson's appeal is now before the court for disposition.

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

In February 1994, Carlson (then 41 years old) was treated by Dr. Rajinder Verma, a family medicine doctor, for complaints of mid-back pain, shoulder pain, and fatigue, and was diagnosed with myofascial pain (Tr. p. 269); she also saw Dr. Verma for sore throats and congestion in 1994, 1995, and 1999 (Tr. pp. 268-270).

In June 2000, Carlson complained to Dr. Verma of pain in both

knees, hands, and feet (Tr. p. 271). In July 2001, Carlson complained of right foot pain and swelling, and was prescribed Kenalog (Tr. p. 272). Carlson complained again in March 2001 of back pain as well as coughing and was treated for bronchitis (Tr. p. 273). Carlson's right foot was swollen again in December 2002, and Dr. Verma prescribed Celebrex (Tr. p. 274). From 2003 through 2009, Carlson complained of muscle aches and spasms; Dr. Verma diagnosed and treated Carlson for arthralgia, possible fibromyalgia, High CRP (complex regional pain), hyperlipidimia, osteoarthritis, hypertension, ankylosing spondylitis, and chronic headaches (Tr. pp. 276-283, 350-351).

In February 2000, Carlson was diagnosed with fibromyalgia at the Freedman Clinic by Dr. Miguel Garcia; tender points were not noted (Tr. pp. 265-266). Carlson was prescribed Vioxx and Zoloft (Tr. pp. 265-266). In May 2000, Carlson was diagnosed with fibromyalgia and costochondritis,[3] tender points were again not noted, and she was prescribed Vioxx (Tr. pp. 263-264). In August 2000, Carlson had 8/18 tender points (their locations were not indicated) (Tr. pp. 261-262). In October 2000, Carlson had 18/18 tender points (Tr. pp. 259-260). In January 2001, Carlson had 8/18

---

[3] Costochondritis is an inflammation of a rib or the cartilage connecting a rib. It is a common cause of chest pain. MEDLINEplus Health Information, Medical Encyclopedia: Costochondritis, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

tender points (no locations indicated) (Tr. pp. 257-258). Through February 2002, Carlson's tender points ranged between 8 and 18 out of 18 (the medical records do not indicate the locations of the tender points); Carlson's medications varied (Tr. pp. 247-261).

In July 2002, the Freedman Clinic found Carlson had a positive straight leg raise and an abnormal range of lumbar motion, and diagnosed "L3-4 disc disease" and prescribed Resteril (Tr. pp. 245-246). From 2002 through January 2008, Carlson was diagnosed at the Freedman Clinic with fibromyalgia and spondyloarthropathy,[4] as well as a meniscal tear in her right knee, and she reported headaches, back pain, fatigue, right knee and hip pain, and watery eyes (Tr. pp. 180-244). In 2008-2009, Carlson received medication from the Freedman Clinic for fibromyalgia, ankylosing spondylitis, and occipital neuralgia (Tr. pp. 330-331, 336-337, 342-343, 345-348).

In June 2004, Carlson was examined by Dr. L. Donovan Perdue, an orthopaedic surgeon. Carlson reported breaking her right foot about a year ago and thought that might have aggravated her knee, but could not recall a knee injury (Tr. p. 137). Dr. Perdue found no appreciable effusion, no ligamentous laxity and a full range of motion in Carlson's right knee, but she was tender along the medial

---

[4] Spondyloarthropathy is any of several diseases (such as ankylosing spondylitis) affecting the joints of the spine. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Spondyloarthropathy, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

joint line (Tr. p. 135). An MRI showed a degenerative tear in the medial meniscus or the right knee and severe degenerative arthritis (Tr. p. 137). Dr. Perdue recommended arthroscopic medial meniscectomy, joint irrigation and debridement, but told Carlson her arthritis would gradually worsen (Tr. p. 137). Carlson opted for a Synvisc injection and was prescribed Darvocet as well (Tr. p. 136). In June 2005, at Christus St. Frances Cabrini Hospital, Carlson received epidural steroid injections at L3-4 to treat discogenic pain in her right leg and lumbar radiculopathy (Tr. pp. 160-164). In June 2006, Dr. Perdue found Carlson's right knee was gradual worsening, noted a medial meniscal tear and arthritis from a previous MRI, and discussed treatment options of Synvisc (warning her that continued cortisone injections may cause her knee to deteriorate faster), arthroscopic debridement and meniscectomy (which may or may not help), and knee replacement (Tr. p. 135).

Carlson also submitted medical records from a cardiac clinic (Dr. Hawthorne) for 2006 through 2009 (Tr. pp. 142-153), from an eye care clinic (Dr. Redmond) from 2002 through 2008 (Tr. pp. 294-309), and from an ear, nose and throat doctor (Dr. Guillory) for 2008 and 2009 (Tr. pp. 316-325).

At her September 18, 2009 administrative hearing, Carlson testified that she was 57 years old, five feet tall, and weighed 150 pounds (Tr. p. 14). Carlson testified that she lives in a home with her husband, has a high school education, and can drive (Tr.

p. 15). Carlson testified she last worked in 1994, processing insurance claims at a doctor's office (Tr. pp. 15-16). Before that, Carlson worked for a doctor, handling insurance and helping with things like progress notes (Tr. p. 16).

Carlson testified that, prior to discontinuing working on July 15, 1994, she was tired, her back hurt, her joints hurt, she ached all over, and she could not do things like climb stairs (Tr. pp. 16-17). Carlson testified that she saw Dr. Fritchie, Dr. Garcia and Dr. Verma from 1994 through 1999, and that Dr. Fritchie diagnosed fibromyalgia and sent her to Dr. Garcia (Tr. pp. 17-18). Carlson testified that Dr. Garcia used to work at Healthsouth before the Freedman Clinic (Tr. p. 26). Carlson testified that Dr. Garcia performed the lab test that diagnosed her ankylosing spondylitis in about 2007, and said she had probably had it for many years before then (Tr. p. 26).

Carlson testified that, between 1994 and 1999, on an average day she would lay down for a while, walk around some, read, and shop for groceries (Tr. p. 20). She could lift and carry a gallon of milk, garden, sweep a little bit, bathe, dress, and fix her hair, but she could not mop; her husband did the cooking (Tr. p. 21). Carlson liked to read and shop for antiques (Tr. p. 22). Carlson had trouble sleeping, she could not walk very far (15 to 20 yards) without taking a break, and standing made her back hurt (Tr. pp. 23-24). Carlson testified that she could sit for an hour but

could not stand for an hour (Tr. p. 23). Carlson testified she could grip things and pick up small objects with her hands, she could get along with people, and she could do light housework for about 15 minutes at a time, then she would have to sit or lay down for ten minutes (Tr. pp. 24, 27). Carlson testified that, from 1994 through 1999, she used to lie down for two or three hours a day (Tr. pp. 27-28). Carlson testified that her feet, knees and lower back used to hurt regularly (Tr. p. 28). Carlson testified that the pain in her back radiated down her legs, she had trouble bending and stooping, she could not squat, and she had difficulty reaching overhead (Tr. pp. 30-31).

Carlson testified that, between 1994 and 1999, she had to make herself get up in the mornings, she would bathe, wash her hair, and dress, straighten up her bed and do a little bit of housework, fix her lunch, then read or watch TV, go to the grocery store if necessary, then put away the groceries (Tr. p. 30).

Carlson testified that Prednisone made her gain weight, Celebrex helped her, Dramamine made her groggy in the mornings, Cenestin (hormones) makes her breasts swell, she did not like the way Vicodin made her feel, and Darvocet 100 gave her dry mouth (Tr. pp. 31-32). Carlson testified that she hurt when she exercised, so her doctor told her not to exercise (Tr. p. 32).

The VE noted that Carlson had not worked in the last fifteen years (Tr. p. 33). The ALJ posed a hypothetical involving a 41-

year-old person with Carlson's education and no work experience, who can lift ten pounds occasionally, walk or stand up to two hours in an eight-hour day, sit up to six hours in an eight-hour day, who needs to make occasional postural changes, and requires a climate-controlled environment (Tr. p. 33). The VE testified that such a person could do sedentary work as a telephone clerk (Tr. pp. 33-34). The VE further testified that, if the person was required to alternate sitting and standing every fifteen minutes, or if she had to alternate sitting for one hour with standing for fifteen minutes, she would not be able to do any work (Tr. pp. 35-36).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Carlson (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131

L.Ed.2d 871 (1995), citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. <u>Greenspan</u>, 38 F.3d at 237.

In the case at bar, the ALJ found that Carlson has not engaged in substantial gainful activity since July 15, 1994, that her disability insured status expired on June 30, 1999, and that she presently has a severe impairment, fibromyalgia, but that, of or before June 30, 1999, Carlson did not have a medically determinable, severe impairment (Tr. p. 46). The sequential analysis thus ended at Step 3, with a finding that Carlson was not disabled (Tr. p. 48).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial,

it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988);

11

Dellolio, 705 F.2d at 125.

## Law and Analysis

### Disability Insured Status

Carlson contends the ALJ improperly opined that there was insufficient evidence to support Carlson's allegations and testimony, and that the ALJ arrived at a residual functional capacity that was contrary to the medical evidence and testimony of Carlson, which the ALJ thought was credible. Carlson further argues the Appeals Council failed to recognize the significance of the additional evidence submitted after the hearing and how it supported the testimony of the claimant. The Commissioner contends Carlson did not carry her burden of proving she was disabled before her disability insured status expired on June 30, 1999.

In the case at bar, Carlson had disability insured status through June 30, 1999. Carlson's relevant medical history in this case is the twelve-month period prior to the month Carlson was last insured for disability, June 30, 1999. 20 C.F.R. § 404.1512(d)(2). As stated by the ALJ (Tr. p. 47), there are no medical records which prove Carlson had fibromyalgia prior to the expiration of her disability insured status on June 30, 1999.

Carlson's medical records show that, in February 1994, Dr. Verma treated Carlson for complaints of mid-back pain, shoulder pain, and fatigue, and was diagnosed with myofascial pain (Tr. p. 269). In June 2000, Carlson complained to Dr. Verma of pain in

12

both knees, hands, and feet (Tr. p. 271). In July 2001, Carlson complained of right foot pain and swelling, and was prescribed Kenalog (Tr. p. 272).

Medical records show that Carlson was treated by Dr. Miguel Garcia and a nurse practitioner, at the Freedman Clinic, from February 2000 through 2009, for fibromyalgia (and other conditions) and was prescribed medication on a regular, continuing basis (Tr. pp. 180-266). It is noted there are no charts of Carlson's tender points in the Freedman Clinic's medical records.[5]

Carlson points to a two-page summary of medical charges from Freedman Clinic, with diagnosis and treatment codes, for the years 1996-1999 (Tr. pp. 358-359), as well as a half page bill to Carlson for charges for treatment in 1997-1998 (Tr. p. 363); Carlson provided those documents to the Appeals Council and contends the

---

[5] A doctor familiar with fibromyalgia can make a diagnosis based on criteria established by the American College of Rheumatology (ACR): a history of widespread pain lasting more than 3 months, and the presence of diffuse tenderness. Pain is considered to be widespread when it affects all four quadrants of the body, meaning it must be felt on both the left and right sides of the body as well as above and below the waist. The American College of Rheumatology also has designated 18 sites on the body as possible tender points. To meet the strict criteria for a fibromyalgia diagnosis, a person must have 11 or more tender points, but often patients with fibromyalgia will not always be this tender, especially men. People who have fibromyalgia certainly may feel pain at other sites, too, but those 18 standard possible sites on the body are the criteria used for classification. MEDLINEplus Health Information: Fibromyalgia, available at http://www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp (a service of the U.S. National Library of Medicine and the National Institutes of Health).

Appeals Council failed to give them appropriate weight (Tr. p. 5). There are no medical records from Dr. Garcia and the Freedman Clinic from 1996 through 1999, although the bill and diagnoses/treatment code summary indicate Carlson received treatment there during those years. Carlson argues that, because those documents bear the codes for fibromyalgia, they prove she had fibromyalgia prior to June 30, 1999. However, those documents are not medical reports that prove Carlson had a severe impairment.[6] Medical reports should include medical history, clinical findings, laboratory findings, a diagnosis, the treatment prescribed with response and prognosis, and a statement about what the patient/claimant can still do. 20 C.F.R. § 404.1513(b). Therefore, the Appeals Council did not err in concluding those records did not change the ALJ's findings.

The ALJ noted that Carlson's first diagnosis of fibromyalgia was in February 2000 at the Freedman Clinic; however the undersigned notes that diagnosis is not supported by any clinical findings (Tr. pp. 265-266). There is not a diagnosis of fibromyalgia that is supported by clinical findings until August 2000, when it is mentioned that Carlson had 8 out of 18 tender

---

[6] Carlson contends in her brief that the Freedman Clinic purged all medical records that were over ten years old, which is why she does not have any from Dr. Garcia for the relevant time period. Carlson further states in her brief that she also received medical treatment from a Dr. Fritchie, but that his medical records were destroyed when he died.

points, although the locations of the tender points are not specified; it is also noted that eight tender points falls short of the standard diagnostic criteria of at least eleven tender points in the eighteen specified locations for at least three months.

Regardless of Carlson's current diagnosis, however, Carlson did not prove she had fibromyalgia on or before June 30, 1999 which precluded her from engaging in any work activity. Therefore, Carlson has not met her burden of proving she had a severe impairment on or before June 30, 1999.

Since substantial evidence supports the ALJ's/Commissioner's finding that Carlson was not disabled on or before June 30, 1999, the Commissioner's final decision should be affirmed.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Carlson's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be

considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of March 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE